1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2

3     ----------------------------------------------------------

4     UNITED STATES OF AMERICA,     Case No.:  0:10-cr-173-MJD-JJG-1

5              Plaintiff,                EXCERPTS

6          vs.                              OF

7     KENNETH LEON WILCOX,                PROCEEDINGS

8              Defendant.              (TESTIMONY OF

9                                      CHARITY HANSEL)

10    ----------------------------------------------------------

11

12

13

14            The above-entitled matter came on for MOTIONS

15    HEARING before Magistrate Jeanne J. Graham, on July 27th,

16    2010, at the United States District Courthouse, 316 N. Robert

17    Street, St. Paul, Minnesota 55101 commencing at approximately

18    1:30 p.m.

19

20

21         OFFICIAL COURT REPORTER:   RONALD J. MOEN, CSR, RMR

22                                     CALIFORNIA CSR NO.:   8674

23                                ILLINOIS CSR NO.:   084-004202

24                                     IOWA CSR NO.:   495

25                                     RMR NO.:   065111

1                          APPEARANCES

2                          OFFICE OF THE UNITED STATES ATTORNEY, 300 South

3       Fourth Street, Suite 600, Minneapolis, Minnesota 55415, by

4       KIMBERLY A. SVENDSEN, Assistant United States Attorney,

5       appeared as counsel on behalf of Plaintiff.

6                          OFFICE OF THE FEDERAL DEFENDER, 300 South

7       Fourth Street, Suite 107, Minneapolis, Minnesota 55415, by

8       DOUGLAS OLSON, Assistant Federal Defender, appeared as

9       counsel on behalf of Defendant.

10

11                           INDEX

| 12 | WITNESS | | D | C | RD | RC |
|----|---------|--|---|---|----|----|
| 13 | CHARITY HANSEL | | 3 | 18 | 33 | |

14

15                         EXHIBITS

| 16 | EXHIBIT | OFFERED | RECEIVED |
|----|---------|---------|----------|
| 17 | GOVERNMENT EXHIBIT 1 | 9 | 9 |
| 18 | GOVERNMENT EXHIBIT 2 | 11 | 11 |
| 19 | GOVERNMENT EXHIBIT 4 | 14 | 14 |
| 20 | GOVERNMENT EXHIBIT 3 | 17 | 17 |
| 21 | DEFENDANT EXHIBIT 1  (Received for | 24 | 24 |
| 22 | Purposes of this hearing) | | |

23

24

25

1            THE COURT:   Okay.   Call your first witness.

2            MS. SVENDSEN:   Yes, your Honor.   The United

3    States calls Charity Hansel.

4            (Court administers oath to the witness).

5            THE COURT:   Please have a seat.   If you could

6    state your name again, and spell your last name, please.

7            THE WITNESS:   Charity Hansel, H-a-n-s-e-l.

8            THE COURT:   S-e-l.   And your first name, again?

9            THE WITNESS:   Charity.

10           THE COURT:   Go ahead and spell that.

11           THE WITNESS:   C-h-a-r-i-t-y.

12           THE COURT:   Thank you.   Go ahead, Counsel.

13           MS. SVENDSEN:   Thank you, your Honor.

14                       CHARITY HANSEL,

15   witness herein, called as a witness by Plaintiff, having been

16   first duly sworn, was examined and testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. SVENDSEN:

19   Q.   Good afternoon, Investigator Hansel.   Where do you work?

20   A.   Coon Rapids Iowa Police Department.

21   Q.   How long have you worked there?

22   A.   Eighteen years.

23   Q.   And what is your current assignment?

24   A.   I'm assigned to the Internet Crimes-Against-Children Task

25   Force with the state police.

1    Q.    How long have you been assigned to the ICAC?

2    A.    Since November of 2008.

3    Q.    And could you briefly describe what your duties and

4    responsibilities are in that position?

5    A.    I investigate persons who possess, exchange or share

6    child pornography via peer-to-peer network on the Internet.

7    I also respond to cyber tips from the National Center of

8    Missing & Exploited Children, and I assist other law

9    enforcement agencies on the eastern side of Iowa with child

10   sexual abuse and exploitation cases.

11   Q.    Before you began working with the ICAC, what was your job

12   at the Cedar Rapids Police Department?

13   A.    I was an investigator in the sex crimes unit.

14   Q.    And for how long did you have that position?

15   A.    Five and a half years.

16   Q.    Have you had training with respect to advising defendants

17   of their constitutional rights under *Miranda v. Arizona*?

18   A.    Yes.

19   Q.    And generally, what procedure do you follow to advise a

20   defendant of his or her Miranda rights?

21   A.    I like them to read the advisory aloud to me and, then,

22   ask them if they understood what they read.

23   Q.    Have you been involved in an investigation involving

24   Kenneth Leon Wilcox?

25   A.    Yes.

1    Q.   How were you involved in that investigation?

2    A.   I was called by my state police commander out of Ankeny

3    to assist Truman, Minnesota officers in interviewing

4    Mr. Wilcox, who had been stopped in Iowa, and was being held

5    at the Buchanan County Jail.

6    Q.   And, as a result of that request, did you conduct an

7    interview with Kenneth Wilcox on December 15th, 2009?

8    A.   Yes.

9    Q.   And do you see Mr. Wilcox present in the courtroom today?

10   A.   I do.

11   Q.   Could you describe where he's sitting, and what he's

12   wearing?

13   A.   He's the white man at the defendant's table, wearing the

14   orange shirt and pants.

15            MS. SVENDSEN:   May the record reflect that the

16   witness has identified the defendant?

17            THE COURT:   It shall.

18   BY MS. SVENDSEN:

19   Q.   So turning your attention to the December 15th, 2009

20   interview, where did that interview take place?

21   A.   In an office at the Buchanan County Courthouse facility.

22   It has the jail and the city police and the county deputies

23   all housed in the same building.

24   Q.   And just to be clear, do you work there?

25   A.   No.

1   Q.   So how did you come to be conducting the interview there

2   on that day?

3   A.   I was called up to assist Buchanan County and the Truman,

4   Minnesota Police Department.   The reason that we were up

5   there was because that's where Mr. Wilcox was being held in

6   custody at.

7   Q.   And who was present during the interview?

8   A.   Another officer from Truman, Minnesota Police.

9   Q.   And would that have been Officer Chad Bonine?

10   A.   Yes.

11   Q.   As well as yourself and the defendant?

12   A.   Yes.

13   Q.   And were there times during the interview when other

14   individuals came into the room?

15   A.   Yes.

16   Q.   Could you describe that?

17   A.   At one point Chief Jobe, who I believe is with Truman,

18   Minnesota Police, as well, came in to give Mr. Wilcox some

19   paperwork from the court in regards to having contact with

20   his daughter and his daughter's mother.   I think at one point

21   Sergeant Johnson came in.   But, for the most part, we were --

22   it was just the three of us.

23   Q.   And where in the building did the interview take place?

24   A.   In Sergeant Johnson's office.

25   Q.   Could you describe what that room is like?

1    A.   It's a room that's ten foot-by-17 foot; it has an

2    L-shaped desk, the wall where the video equipment is at has

3    three large bookcases along the wall, and there was some --

4    there was at least three chairs in the room and, then, there

5    were some other things stacked up against the wall behind us.

6    And a single door.

7    Q.   And where was the door located in the room?

8    A.   It would have been to my right.  Mr. Wilcox and I were

9    seated closest to the door.

10   Q.   How did the defendant come into the room?

11   A.   He was brought into the doorway of the room.  He had leg

12   shackles and handcuffs on.

13   Q.   And was he brought into the room by another officer?

14   A.   By someone from Buchanan County.

15   Q.   And what happened when he got into the room?

16   A.   His handcuffs were removed and he was seated in a chair

17   directly across from me, by the door.

18   Q.   So you were seated directly across from the defendant;

19   correct?

20   A.   Yes.

21   Q.   Where did Officer Bonine sit?

22   A.   He sat on the other side of Sergeant Johnson's desk.

23   Q.   How far or close were each of you to the defendant?

24   A.   I was pretty close.  I would say our knees were probably

25   a foot apart.  So our bodies were three-foot apart.  The

1    other officer sat on the other side of the desk, so he was

2    several feet away from the defendant.

3    Q.   How were you dressed during the interview?

4    A.   I had on a pair of socks and a sweater.

5    Q.   And how was Officer Bonine dressed?

6    A.   He had on a pair of khaki slacks and a dark-colored

7    shirt-jacket.

8    Q.   How did the interview begin?

9    A.   I introduced myself, and where I worked, and we sat down,

10   and I asked him a few personal questions.

11              MS. SVENDSEN:   Your Honor, may I approach the

12   witness?

13              THE COURT:   You may.

14   BY MS. SVENDSEN:

15   Q.   I'm showing you a document that's been marked as

16   Government's Exhibit 1.   What is that document?

17   A.   This is a document that I have prepared over the years to

18   ask persons questions prior to an interview.

19   Q.   And is that a true and correct copy of the personal

20   information questionnaire that you would have used in the

21   beginning of your interview with this defendant?

22   A.   Yes.

23   Q.   Under what circumstances do you use this questionnaire

24   and go over these questions with the defendant at the

25   beginning of an interview?

1    A.   An in-custody-type interview.

2    Q.   And do you do that for every in-custody interview that

3    you conduct?

4    A.   I do.

5    Q.   What is the purpose for you to review these questions

6    with the defendant?

7    A.   I use this so I can evaluate their level of functioning,

8    their level of understanding.  I think it's unfair to set

9    down the Miranda warning, with three or four sentences in the

10   Miranda warning, for me to be able to determine whether

11   someone can understand them well enough to waive their

12   rights.

13   Q.   And do some of the questions also ask for biographical

14   information from the defendant?

15   A.   Yes.

16   Q.   Do any of the questions on the questionnaire relate to

17   the crime for which the person has been arrested?

18   A.   No.

19              MS. SVENDSEN:   Your Honor, I offer Government's

20   Exhibit 1.

21              THE COURT:   Any objection?

22              MR. OLSON:   No, your Honor.

23              THE COURT:   Government's Exhibit 1 is received.

24   BY MS. SVENDSEN:

25   Q.   After you completed going through those personal

1    information questions, then what happened?

2    A.   Then I moved a little bit closer to him and set down the

3    Miranda warning sheet that we have and had him read it aloud

4    to me.

5    Q.   And did the defendant then read each of those rights

6    aloud to you?

7    A.   Yes, he did.

8    Q.   What happened after the defendant had read each of the

9    rights aloud?

10   A.   I asked him if he understood them.

11   Q.   And how did he respond?

12   A.   He said that he did.

13   Q.   Then what happened?

14   A.   I asked him if he wanted to talk to me that day, and he

15   said he did, so I asked him to sign the form.

16   Q.   And how did the defendant respond to that?

17   A.   He said he did want to talk to me, and he did sign the

18   Miranda warning.

19   Q.   And what did you do with that completed form after the

20   interview was completed?

21   A.   I gave it to Chief Jobe.

22   Q.   And do you have a copy of that completed form in your

23   case file?

24   A.   No.

25   Q.   Could you explain why that is?

1    A.   I knew the case wasn't my case, an Iowa case, and it just

2    made more sense to send the original evidence up to Truman,

3    Minnesota.

4              MS. SVENDSEN:   Your Honor, may I approach the

5    witness?

6              THE COURT:   You may.

7    BY MS. SVENDSEN:

8    Q.   Showing you what's been marked as Government's Exhibit 2,

9    what is that document?

10   A.   The Waiver of Rights that we use at the police

11   department.

12   Q.   And is that a true and correct copy of the Miranda form

13   that you reviewed with the defendant in this case?

14   A.   Yes.

15   Q.   But the form is blank; is that correct?

16   A.   Yes.

17   Q.   Is that the same form that you use for all the custodial

18   interviews that you conduct?

19   A.   Yes.

20             MS. SVENDSEN:   Your Honor, I offer Government's

21   Exhibit 2.

22             MR. OLSON:   No objection.

23             THE COURT:   Exhibit 2 is received.

24   BY MS. SVENDSEN:

25   Q.   Was the interview that you conducted with the defendant

1   audio recorded?

2   A.   Yes.

3   Q.   How?

4   A.   I audio recorded it with my recorder.

5   Q.   And was it audio recorded in some other way, as well?

6   A.   I believe that the Truman, Minnesota Police also had a

7   recorder.  I don't know if it recorded or if it was

8   functioning.

9   Q.   When was your recorder turned on?

10  A.   I turned it on prior to the defendant being brought into

11  Sergeant Johnson's office.

12  Q.   And where was your recorder placed?

13  A.   On Sergeant Johnson's desk.

14  Q.   Was that recorder out in plain sight during the

15  interview?

16  A.   Yes.

17  Q.   At any time during your interview with the defendant was

18  the recorder turned off?

19  A.   No.

20  Q.   After you had obtained the recording of the entire

21  interview, what did you do with the recording?

22  A.   I took it back to the police department, where I

23  transferred it from the recorder to my undercover laptop

24  computer, then it was immediately transferred to a CD/DVD.

25  Q.   And what happened to that CD/DVD?

1    A.   The original went into our locked evidence bureau at the

2    police department, and a copy was sent up to Chief Jobe.

3    Q.   And just to clarify, could you describe what kind of

4    recording device you were using?

5    A.   It's a hand-held digital voice recorder.

6    Q.   So there's no tape, or anything, in the recorder, it just

7    makes a digital recording; is that correct?

8    A.   Yes.

9            MS. SVENDSEN:   Your Honor, may I approach the

10   witness?

11           THE COURT:   You may.

12   BY MS. SVENDSEN:

13   Q.   I'm showing you what's been marked as Government's

14   Exhibit 4 -- I seem to have slipped the numbers on a couple

15   of these -- but can you tell me what that is?

16   A.   This is a copy of the recording that I made of my

17   interview with Mr. Wilcox.

18   Q.   And how did you go about creating that copy that you

19   made?

20   A.   We have a burner at the police department, where you can

21   put the original disk in and, then, a blank disk underneath

22   and, then, make an exact recording onto the new disk.

23   Q.   And have you listened to that recording prior to coming

24   here today?

25   A.   Yes.

1    Q.   Is that a fair and accurate recording of the interview?

2    A.   Yes.

3    Q.   Was there ever a time when you left the room during the

4    interview?

5    A.   Yes.

6    Q.   Approximately how long were you gone?

7    A.   I left approximately an hour and nineteen minutes into

8    the interview.  And I came back just before the interview was

9    concluded.

10   Q.   And, so, during the time that you were gone, based on

11   your review of the recording, did the recorder continue to

12   record?

13   A.   Yes.

14   Q.   And is that recording fair and accurate for the time that

15   you were in the room?

16   A.   Yes.

17            MS. SVENDSEN:   Your Honor, I offer Government's

18   Exhibit 4.

19            MR. OLSON:   No objection.

20            THE COURT:   Received.

21   BY MS. SVENDSEN:

22   Q.   Was the interview with the defendant recorded in any

23   other way?

24   A.   It was video recorded.

25   Q.   Did you operate that video-recording equipment yourself?

1    A.   No.

2    Q.   Why not?

3    A.   I was in an unfamiliar setting, and I did not know how to

4    run their equipment.

5    Q.   So who operated that equipment, if you know?

6    A.   Sergeant Johnson.

7    Q.   Have you had an opportunity to view the video recording

8    of the interview?

9    A.   Yes.

10   Q.   When does it begin?

11   A.   It begins at approximately two p.m.

12   Q.   And what's happening when the video begins?

13   A.   You can see Sergeant Johnson in the room, the two Truman

14   officers and myself.

15   Q.   And does that start prior to the defendant being brought

16   into the room?

17   A.   Yes.

18   Q.   Is the entire interview recorded?

19   A.   Yes -- I'm sorry -- the video appears to miss the last

20   couple of minutes of the interview before he's taken out of

21   the room.

22   Q.   And do you recall approximately how much time that would

23   be?

24   A.   I believe it was shut off about eight or nine minutes, it

25   looks like, before my audio recording stopped, because we

1    were all in the room still with the defendant when the video

2    was shut off.

3    Q.   And the audio recording, then, continues until the time

4    that the defendant is taken out of the room; correct?

5    A.   Yes.

6              MS. SVENDSEN:   Your Honor, may I approach the

7    witness?

8              THE COURT:   You may.

9    BY MS. SVENDSEN:

10   Q.   I'm showing you what's been marked as Government's

11   Exhibit 3.   What is that?

12   A.   This is the two disks of the video recording with

13   Mr. Wilcox.

14   Q.   And could you just describe what the two disks are?

15   A.   They're on two different disks because it was about a

16   two-hour and four-minute interview.   And, so, it's divided on

17   two different disks, I assume, because it couldn't all fit on

18   to one.

19   Q.   And have you had an opportunity to view these particular

20   DVDs that are before you?

21   A.   Yes.

22   Q.   For the parts of the interview for which you were

23   present, is this a true and correct recording of the

24   interview?

25   A.   Yes.

1    Q.   Is there some issue with the sound on that recording?

2    A.   The sound on this is very poor.

3    Q.   But for what it is pictured on the video, it's a fair and

4    accurate recording; is that correct?

5    A.   Yes.

6              MS. SVENDSEN:   Your Honor, I offer Government's

7    Exhibit 3.

8              MR. OLSON:   No objection.

9              THE COURT:   Exhibit 3 is received.

10   BY MS. SVENDSEN:

11   Q.   During the course of the interview, did the defendant

12   ever ask for an attorney?

13   A.   No.

14   Q.   Did he ever ask to stop the questioning?

15   A.   No.

16   Q.   What was the tone of the interview?

17   A.   It was conversational.

18   Q.   And during the course of the interview, did either you or

19   Officer Bonine ever yell at the defendant?

20   A.   No.

21   Q.   Was he threatened in any way?

22   A.   No.

23   Q.   Were any promises made to him?

24   A.   No.

25   Q.   Based on your interview with the defendant, what, if

1    anything, could you tell about whether he appeared to be

2    intoxicated by either drugs or alcohol?

3    A.   No, he was not.

4    Q.   How did he track your questions?

5    A.   Very well.

6    Q.   Did he appear to understand the questions you were asking

7    him?

8    A.   He did.

9    Q.   And did he give appropriate responses that were

10   responsive to the questions?

11   A.   Yes.

12   Q.   What happened when the interview concluded?

13   A.   When the interview was concluded, he was rehandcuffed and

14   then taken back, I assume, to a cell there at Buchanan County

15   Jail.

16   Q.   Approximately how long did the interview last?

17   A.   Two hours and four minutes.

18            MS. SVENDSEN:   Thank you, your Honor.

19            THE COURT:   Okay.   Cross-exam.

20                    CROSS-EXAMINATION

21   BY MR. OLSON:

22   Q.   Officer Hansel, I'm Doug Olson.   I represent Mr. Wilcox.

23   Good afternoon.   Let's see.   You've been a police officer,

24   investigator for over 18 years; is that correct?

25   A.   I've been an officer for 18.   I've been an investigator

1       since November of 2001.

2       Q.    And you were involved in sex crimes investigations for

3       over five years; right?

4       A.    Yes.

5       Q.    And, then, you've been doing Internet pornography and

6       related activities for the last what, year or two?

7       A.    Yes.

8       Q.    Okay.  So that's kind of become your area of specialty;

9       right?

10      A.    Yes.

11      Q.    And, specifically, now you've gone from just general sex

12      crimes into Internet pornography and related topics; right?

13      A.    Yes.

14      Q.    And, so, on December 15th, you were specifically sought

15      out and called to assist in this investigation based on your

16      expertise in this area; right?

17      A.    Yes.

18      Q.    And, so, you drove from where your office is in Cedar

19      Rapids up to Buchanan County; right?

20      A.    Yes.

21      Q.    Were you at the Buchanan County Courthouse, then?  Is

22      that where this took place?

23      A.    Yes.

24      Q.    And how long a drive is it from Cedar Rapids to the

25      Buchanan County Courthouse?

1    A.    Forty to 45 minutes.

2    Q.    Okay.  Now, Mr. Wilcox had been arrested -- your

3    interview with Mr. Wilcox took place on December 15th, 2009;

4    right?

5    A.    Yes.

6    Q.    Mr. Wilcox was arrested on December 14th; right?

7    A.    That I don't know.

8    Q.    Well, sometime in the afternoon, his truck was stopped --

9    I mean, you're basically aware that sometime the day before

10   his truck was stopped somewhere else; right?

11   A.    I knew that his truck had been stopped, yes, sir.  I'm

12   just not sure when.

13   Q.    Okay.  But sometime the previous day; right?

14   A.    That I wasn't -- I was just aware that he had been

15   stopped, and he was being held at Buchanan County Jail.

16   Q.    When you started interviewing him, did you know how long

17   he had been in jail?

18   A.    No.

19   Q.    You didn't ask anybody how long this man's been sitting

20   in jail?

21   A.    No.

22   Q.    But you knew that he was sitting in jail on a 48-hour

23   hold; right?

24   A.    Yes.

25   Q.    In fact, in your police report, you indicated that

1    Mr. Wilcox's truck had been stopped on the scales on I-380

2    just south of Waterloo, and was currently being held in the

3    Buchanan County Jail on a 48-hour police hold from Truman,

4    Minnesota.  Right?

5    A.   Yes.

6    Q.   Okay.  So you get a call.  Did you get a call from

7    Sergeant Johnson asking for your assistance?

8    A.   No; from my commander on the task force, Gerard Meyers,

9    who's in Ankeny, Iowa.

10   Q.   Okay.  So somehow word got relayed to your commander for

11   you to come to assist these people in law enforcement in

12   Buchanan; right?

13   A.   Yes.

14   Q.   Excuse me, is Buchanan a city or is that just a county?

15   A.   It's a county.

16   Q.   And what city are you in?

17   A.   I believe it's Independence.

18   Q.   Okay.  How long were you at the Buchanan County

19   Courthouse before you started the interview with Mr. Wilcox?

20   A.   Approximately 20 minutes.

21   Q.   And in the interview room with you, you said, was Officer

22   Chad Bonine; right?

23   A.   Yes.

24   Q.   And he's a Truman police officer; right?

25   A.   Yes.

1   Q.   During the course of the interview, he sat behind the

2   desk; right?

3   A.   Yes.

4   Q.   Were you already in the room when Mr. Wilcox was brought

5   into the room?

6   A.   Yes.

7   Q.   The two of you sat in two chairs across from the desk;

8   right?

9   A.   Myself and Mr. Wilcox.

10  Q.   Yes.

11  A.   Yes.

12  Q.   Okay.  And you were seated -- I think you stated that

13  your knees were about a foot apart; right?

14  A.   Yes.

15  Q.   You were not in uniform; right?

16  A.   No.

17  Q.   And he was clearly in custody when he -- he was in

18  custody the entire time; right?

19  A.   Yes.

20  Q.   Now, you started off asking him questions that you

21  described off your biographical sheet, which is Exhibit 1;

22  right?

23  A.   Yes.

24  Q.   And you went through all those matters, and you talked

25  with him for a period of time before you gave him a Miranda

1    warning; right?

2    A.   Yes.

3    Q.   So there were a number of questions posed to him and

4    answers that he gave back before you gave him a Miranda

5    warning; right?

6    A.   Yes.

7    Q.   And a transcript was prepared from the interview that you

8    had with Mr. Wilcox; right?

9    A.   I was told yesterday that there is a transcript.  I've

10   not seen it.

11                   MR. OLSON:   May I approach the witness, your

12   Honor?

13                   THE COURT:   You may.

14   BY MR. OLSON:

15   Q.   I'm showing you my copy of the transcript that was

16   prepared of the interview between you and Mr. Wilcox.  It's

17   Bates stamp is Number 6, and it goes through Bates stamp 90,

18   85 pages.  Do you want to just take a look and see if that

19   looks like it's the transcript of the interview.

20   A.   It appears to be.

21                   MR. OLSON:   Your Honor, I'm going to offer into

22   evidence this as Defendant's -- shall I call this Defendant's

23   Exhibit 1 or...?

24                   THE COURT:   Yes.

25                   MR. OLSON:   Because I don't have this marked.

1          THE COURT:  We'll mark it.  And we'll have to

2     get copies of it, I assume.

3          MR. OLSON:  Yes, because I don't have another

4     copy of it.  So can I just use it and we'll mark it here?

5          THE COURT:  Any objection?

6          MS. SVENDSEN:  Your Honor, no objection to its

7     admission for purposes of this hearing.  I would just note

8     that the recording is before the Court.  So to the extent

9     that there's any disagreement between the transcript and the

10    recording, the Court, I would request, would use the

11    recording.

12         THE COURT:  Understood.  For purposes of this

13    hearing, Defendant's Exhibit 1 will be received.

14         MR. OLSON:  I'm going to use this because it

15    would be clumsy to use the actual recording.  So we'll only

16    use the transcript.

17         THE COURT:  And, Mr. Olson, if you're going to

18    stand there, you're either going to have to turn towards the

19    court reporter or keep your voice up or we're going to have

20    to have you do it from there.  Okay.  Go ahead.

21    BY MR. OLSON:

22    Q.  So, obviously, this was all recorded, it was video

23    recorded and audio recorded, and that's all accurate, and

24    this is just a transcript that someone else has prepared;

25    right?

1    A.    Yes.

2    Q.    Okay.  So I'm just going to ask you a few questions from

3    this transcript.  Okay?

4    A.    Okay.

5    Q.    All right.  When you started off your questioning, the

6    way that you introduced yourself, you came into the room and

7    you introduced yourself and you asked Mr. Wilcox how he was;

8    right?

9    A.    Yes.

10   Q.    And his response was:  "Not in the best of moods under

11   the circumstances."  Right?

12   A.    Yes.

13   Q.    And, then, you told him:  "Okay.  Well, I'll be nice.

14   Okay"?

15   A.    Yes.

16   Q.    And that's how you started off the interview; right?

17   A.    Yes.

18                    THE COURT:   And that was page one?

19                    MR. OLSON:   That's page one of the interview,

20   your Honor.

21                    THE COURT:   Okay.

22   BY MR. OLSON:

23   Q.    And, then, you went through the biographical particulars

24   that we talked about off your questions from Exhibit 1;

25   right?

1    A.    Yes.

2                    MR. OLSON:   Can I just have permission to

3    approach the witness and question from there?   Probably

4    easier.

5                    THE COURT:   You may.   But I'm going to have to

6    make sure we keep, as I said, our voice up, and facing as

7    much as we can this way.   And Tell me what page, if you're

8    talking about the transcript.

9    BY MR. OLSON:

10   Q.    And at least from the transcript, it isn't until page 13

11   that you actually got around to going through the Miranda

12   warning with him; right?

13   A.    Yes.

14   Q.    Okay.   And, so, all the questions and answers before page

15   13 were not preceded by the Miranda warning; correct?

16   A.    Yes.

17   Q.    Okay.   I'm going to go back and ask you some questions.

18   On page 12 of the transcript, you're going through the

19   biographical information and, then, you finally introduce

20   Officer Bonine; right?

21   A.    Yes.

22   Q.    And how do you introduce Officer Bonine to Mr. Wilcox on

23   page 12 of the transcript?

24   A.    "This is my friend Chad."

25   Q.    Okay.   And, so, when you got around to introducing the

1    other officer, you said to Mr. Wilcox:  "By the way, this is
2    my friend Chad."  Right?
3    A.   Yes.
4    Q.   And, then, you proceeded to page 12 again.  You told him
5    why you were there; right?
6    A.   Yes.
7    Q.   And at the bottom of the page 12, what did you tell
8    Mr. Wilcox as to why you were there?
9    A.   Issues with his computer equipment.
10   Q.   And, specifically, you told him:  "Why I'm here is
11   there's some issues maybe with your computer equipment.
12   There are some things on there that we may need to talk
13   about.  Okay"?  Right?
14   A.   Yes.
15   Q.   All right.  And, then, you got into the Miranda warning;
16   right?
17   A.   Yes.
18   Q.   And before you read him the Miranda warning, you told
19   Mr. Wilcox that:  "I'm not here to arrest you.  I'm just here
20   to talk to you.  Okay"?  Right?
21   A.   Yes.
22   Q.   And, then, again before you read him the Miranda warning,
23   on page 13, you again told him:  "I'm not here to arrest you.
24   What's going on in Minnesota -- I don't work up there.  What
25   I'm concerned about is your truck and what is in your truck.

1    Okay"?  Right, that's what you told him?

2    A.   Yes.

3    Q.   Now, was that truthful?  Is that the reason you were

4    there to question him because you were concerned about what

5    was in his truck?

6    A.   Yes.

7    Q.   And, then, after reading him the Miranda warning, at the

8    top of page 14, you started talking again about the reasons

9    that you were there; right?

10    A.   Yes.

11    Q.   And you told him:  "Okay.  I work Internet stuff, and it

12    has come -- it kind of come to our attention that there might

13    be some things going on with your computer that's on there

14    that shouldn't be on there."  Right?

15    A.   Yes.

16    Q.   And, then, Mr. Wilcox said:  "Okay."  Right?

17    A.   Yes.

18    Q.   Then you told him:  "And I just want to tell you, okay?

19    I'm not here to judge you.  That's not my job.  I just want

20    to talk to you.  And my job is to help families that have

21    gotten off track on something to try and get back on."

22    Right?

23    A.   Yes.

24    Q.   And, then, you started asking him questions about the

25    computers; right?

1    A.   Yes.

2    Q.   And, then, during the course of your interview, you

3    started asking him questions about the computers; right?

4    A.   Yes.

5    Q.   And, then, towards the bottom of page 16, Mr. Wilcox

6    suggested that his daughter had been making some sexual --

7    some questions about his daughter saying that he had been

8    making some sexual advances and that's why he was sitting in

9    jail.  And that's what he told you; right?

10   A.   Yes.

11   Q.   And, then, you responded:  "I'm going to help you get to

12   the bottom of that.  Okay?  Because, like I said, we want the

13   family to get on track.  We want to get things straightened

14   out.  And that's my job to help you to do that.  Okay?  So

15   let's go with this computer.  So it's always been in your

16   truck."  Right?

17   A.   Yes.

18   Q.   And, then, you proceeded to talk about the computers some

19   more.  And, then, it really wasn't until page 27 from the

20   transcript of this interview, after talking with Mr. Wilcox,

21   that you really got into the reason that you're there; right?

22   A.   Yes.

23   Q.   And at the top of page 27, you stopped talking about this

24   computer business and you said to Mr. Wilcox:  "Well, let me

25   -- do you mind if I tell you what's going on here?  Because I

1    want -- the one thing that you and I need to be today is

2    honest with each other.  Here's the thing I know from talking

3    to you."  And he said:  "Okay."  And you said:  "You have a

4    great kid.  You know, she has a stumbling block, but what kid

5    doesn't; right"?  Mr. Wilcox said:  "Yes."  Then you told

6    him:  "That she clearly loves you and has a lot of respect

7    for you and looks up to you.  You know, she has some

8    troubling times.  I've been a cop for 18 years, and one thing

9    I found out over the years is kids usually act out because

10   there's something going on, something's bothering them.  I

11   think we can -- all right."  And, then, he started talking

12   about her problems; right?

13   A.   Yes.

14   Q.   Then you continued on at the bottom of page --

15              THE COURT:  Let's paraphrase some of these

16   portions.  Okay?

17              MR. OLSON:  Okay.

18   BY MR. OLSON:

19   Q.   At the bottom of page 27, once again you said that you

20   wanted him to be honest with you, and then you said:  "But I

21   think we need to get the family some help."  Right?

22   A.   Yes.

23   Q.   And, then, continuing on on page 28 -- now, at this point

24   in time, 28 pages into the interview, he hasn't made any

25   admissions, he hasn't talked about any sexual acts with his

1    daughter; right?

2              MS. SVENDSEN:  Objection, your Honor.  The

3    witness hasn't had an opportunity to review the 27 prior

4    pages.

5              THE COURT:  I would agree with that.  If you

6    need to paraphrase -- or -- I mean, rephrase your question.

7    BY MR. OLSON:

8    Q.  Do you recall if, after this point in the interview, he

9    had made any admissions or talked about any sexual conduct

10   with his daughter?

11   A.  What I recall is 35 minutes into it is the part that you

12   had pointed out just a little bit ago about talking about the

13   case.  And at 41 minutes into the interview is when he made

14   his first admission about sexually abusing his daughter.

15   Q.  Okay.  And where he first made his admissions about

16   having sex with his daughter came on page 30; right?

17   A.  Yes.

18   Q.  And the first thing -- I mean, you went back and listened

19   to the tape; right?

20   A.  Yes.

21   Q.  And I think you said 41 minutes into it, the first thing

22   that he says that would be an admission or an acknowledgement

23   of having sex is when he said:  "She came to me and proposed

24   it."  Right?

25   A.  Yes.

1   Q.   And, then, from there on out, the subject matter of the

2   interview is primarily about what had happened between him

3   and his daughter; right?

4   A.   Yes.

5   Q.   Okay.  And in the pages 28, 29 and 30, leading up to

6   where he finally confessed and started talking about having

7   sex with his daughter, you continued to make statements to

8   him to the effect that you were trying to help him, that you

9   weren't trying to judge him, and that you were trying to lift

10   the burden off his shoulders; right?

11   A.   Trying to help the family, yes.

12   Q.   Okay.  And everything that you said to him in order to

13   get him to start talking is on the audiotape; right?

14   A.   Yes.

15   Q.   And, then, it's reflected in the transcript here; right?

16   A.   It appears to be, yes.

17   Q.   Okay.  So, basically, it took you 41 minutes to break

18   Mr. Wilcox down and get him to start talking about having sex

19   with his daughter; right?

20   A.   Yes.

21   Q.   And that's why you were brought in, for your expertise,

22   to conduct the interview with Mr. Wilcox; right?

23   A.   Yes.

24   Q.   And this interview that took place was about a total of

25   two hours in length; right?

1   A.   Yes.

2   Q.   And during the course of the interview, you sat less than

3   a foot away from Mr. Wilcox; right?

4   A.   Yes.

5   Q.   And you turned and you were face to face with him; right?

6   A.   Yes.

7   Q.   And at various points in time, you placed your hands on

8   his knees; right?

9   A.   It looks like a couple of times I reached over and I

10   would pat one of his knees with one of my hands.

11   Q.   Okay.  And you patted his knees, you touched him, prior

12   to him breaking down and starting to talk with you about the

13   sex that he'd had with his daughter?

14   A.   I don't specifically recall when I did it.

15   Q.   Okay.  It would otherwise be reflected on the videotape;

16   right?

17   A.   Yes.

18              MR. OLSON:   Okay.  I have no further questions,

19   your Honor.

20              THE COURT:   Okay.  Redirect.

21              MS. SVENDSEN:   Very briefly, your Honor.

22              THE COURT:   All right.

23                    REDIRECT EXAMINATION

24   BY MS. SVENDSEN:

25   Q.   Investigator Hansel, prior to beginning your interview

1    with the defendant, had you received any information from law

2    enforcement related to the defendant's computers?

3    A.   Yes.

4    Q.   What information had you received?

5    A.   The information I had received was there was some sexual

6    allegations made with his daughter.  They had done a search

7    warrant, there was some videotapes or things found, and he

8    would have computer equipment and cameras that may have been

9    used to record those acts in his semi.

10   Q.   And what would the computer equipment have been used for?

11   A.   To record sexual acts with himself and his daughter.

12                   MS. SVENDSEN:  Nothing further, your Honor.

13                   THE COURT:  Okay.

14                   THE COURT:  Any recross on that part?

15                   MR. OLSON:  No, your Honor.

16                   THE COURT:  Okay.  Thank you.  You're excused.

17                   All right.  Any further witnesses on behalf of

18   the United States?

19                   MS. SVENDSEN:  No, your Honor.

20                   THE COURT:  All right.  Any witnesses,

21   Mr. Olson, on this matter?

22                   MR. OLSON:  No, your Honor.

23

24

25

1                          CERTIFICATE PAGE

2

3          I, Ronald J. Moen, Official Shorthand Reporter, CSR,
   RMR, and a Notary Public for the county of Hennepin, state of
4  Minnesota, do hereby certify:

           That the said MOTIONS HEARING was taken before me as
5  an Official Shorthand Reporter, CSR, RMR, and a Notary Public
   at the said time and place and was taken down in shorthand
6  writing by me;

7          That said MOTIONS HEARING was thereafter under my
   direction transcribed into computer-assisted transcription,
8  and that the foregoing transcript constitutes a full, true
   and correct report of the EXCERPTS OF PROCEEDINGS which then
9  and there took place;

10         That I am a disinterested third person to the said

11 action;

12         That the cost of the original has been charged to the
   party who ordered the EXCERPTS OF PROCEEDINGS of the MOTIONS
13 HEARING, and that all parties who ordered copies have been
   charged at the same rate for such copies.
14
           That I reported pages 1 through 35 of the Excerpts of
15 Proceedings.

16         IN WITNESS THEREOF, I have hereto subscribed my hand
   this 5th day of August, 2010.
17

18

19
                              s/Ronald J. Moen
20                            RONALD J. MOEN,
                              OFFICIAL SHORTHAND REPORTER,
21                            CSR, RMR

22

23

24

25