# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 10-173 (MJD/JJG) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| Kenneth Leon Wilcox, | |
| Defendant. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motion hearing on July 27, 2010. Kimberly Svendsen appeared on behalf of the United States of America. Douglas Olson appeared on behalf of Defendant Kenneth Leon Wilcox. The case was referred to this Court for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Trial is presently set to commence before the Honorable Michael J. Davis, Chief Judge, United States District Court, on Monday, September 27, 2010.

## I.  BACKGROUND

On June 15, 2010, a federal grand jury charged Defendant by Indictment with five counts of interstate transportation of a minor with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), and five counts of production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e). Defendant subsequently filed two dispositive motions, both of which are at issue here. Through his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, Defendant challenges several seized items as outside the scope of the

warrants. In Defendant's Motion to Suppress Statements, he seeks to suppress a statement he gave to Cedar Rapids Police Officer Charity Hansel on December 15, 2009.

## II. DEFENDANT'S STATEMENT TO OFFICER HANSEL

### A. Facts

Officer Hansel is employed by the Police Department in Cedar Rapids, Iowa, and is assigned to a multi-jurisdictional Internet Crimes Against Children Task Force ("Task Force"). Her duties include investigating individuals who possess or share child pornography on the Internet, responding to cyber tips from the National Center for Missing and Exploited Children, and assisting other law enforcement agencies with child sexual abuse and exploitation cases. She has been assigned to the Task Force since November 2008. Prior to that, she worked as an investigator in the sex crimes unit of the Cedar Rapids Police Department for five years. In total, she has worked as a police officer for eighteen years.

Defendant is a professional semi-truck driver. On December 14 or 15, 2009, police stopped Defendant's truck, took him into custody, and placed him on a forty-eight-hour hold at the Buchanan County Jail in Independence, Iowa. Officer Hansel was informed that Defendant's minor daughter, B.C., had recently made some sexual allegations against him, that videotapes of sexual acts between Defendant and B.C. had been seized from Defendant's home, and that computer equipment and cameras used to make the videotapes would likely be found in Defendant's semi-truck. Task Force Commander Gerard Meyers asked Officer Hansel to interview Defendant at the Buchanan County Jail, which is approximately a forty-five-minute drive from Cedar Rapids.

The interview began at approximately 2:00 p.m. on December 15, 2009, and took place in an office at the jail. Officer Hansel and Officer Chad Bonine from the Truman, Minnesota Police

Department were both present. Before Defendant was escorted into the office, Officer Hansel activated her digital audio recorder and placed it on the desk. Defendant entered the room wearing leg shackles and handcuffs. His handcuffs were removed, and he was seated in a chair facing Officer Hansel. Officer Bonine sat on the other side of a desk. Both officers were casually dressed and did not display their weapons.

Officer Hansel began the interview by introducing herself and asking Defendant how he was doing. Defendant replied, "Not in the best of moods under the circumstances." (Def.'s Ex. 1 at 1.) Officer Hansel replied, "Okay, well, I'll be nice, okay?" (*Id.*) Defendant responded, "I hear allegations are being made against me by my daughter, because she [sic] threatened to report her as a run away and now I'm paying the consequences." (*Id.*)

Officer Hansel has a standard procedure for interrogating suspects in custody, which she consistently follows. She begins each interview by asking questions from a Personal Information Questionnaire ("Questionnaire") that she has developed over the years. (Gov't Ex. 1.) She uses the Questionnaire to evaluate the suspect's level of functioning and understanding before she administers the *Miranda* advisory and asks for a waiver. After Officer Hansel introduced herself and Defendant mentioned the allegations made by his daughter, Officer Hansel redirected the conversation to the biographical questions listed on the Questionnaire. She asked Defendant his first, middle, and last name; his age and date of birth; his height, weight, and eye color; his home address and phone number; his employer and job title; his level of education; his military background; his place of birth, mother's name, and father's name; the name of his wife or significant other; and his daughter's name and date of birth. Officer Hansel then asked some questions to gauge Defendant's level of understanding, such as whether he had any problems speaking, hearing, writing, or remembering. She asked Defendant whether he had ever had

amnesia or received treatment for mental health issues. When Defendant said he had been evaluated by a psychiatrist in connection with treatment for alcoholism, Officer Hansel asked about the results and diagnosis. She asked whether he was currently taking any medication or had consumed any alcohol or drugs in the past twenty-four hours. She asked about Defendant's prior experiences with law enforcement.

After completing the Questionnaire, Officer Hansel introduced Officer Bonine as her "friend, Chad." (Def.'s Ex. 1 at 12.) She told Defendant she was there to talk with him about his computer equipment and his truck. She said she did not intend to arrest Defendant, but simply wanted to talk. Officer Hansel then asked Defendant to read aloud his *Miranda* rights from a written form, and he did. When she asked Defendant if he understood his rights and wanted to talk with her, he answered yes to both questions and signed a written waiver.

Officer Hansel told Defendant that she worked on "internet stuff" and had learned "that there might be some things going on with your computer . . . that shouldn't be on there." (*Id.* at 14.) She told Defendant she would not judge him, and that her job was "to help families that have gotten off track on something to try and get back on." (*Id.*) When Officer Hansel asked Defendant several questions about his computer and internet access, he readily answered the questions and said that his daughter, B.C., had used the computer in his truck at times. When Defendant then referred to accusations B.C. had made against him, Officer Hansel said, "I'm going to help you get to the bottom of that. Okay, 'cause like I said we want the family to get on trac[k], we want to get things straightened out." (*Id.* at 16.) Officer Hansel then turned the conversation back to Defendant's computer, camera, and video camera. Eventually, Defendant said that B.C. had taken several naked pictures of herself with his cellular phone.

Officer Hansel and Defendant next discussed his daughter's schooling, her experiences with foster care and the juvenile justice system, and her friends. When the conversation shifted to B.C.'s sexual experience, Officer Hansel told Defendant she wanted to be honest with him. She said his daughter was a great kid, but had obviously had some trouble. Officer Hansel said she wanted to help Defendant and his daughter, but to accomplish that, they needed to talk about the videotapes seized from his home the day before. She told Defendant that she wanted a burden to be lifted from his shoulders, that she was concerned about B.C., and that it was time to do the right thing. She informed Defendant that her specialty was in the sex crimes unit and that B.C. had given a very credible interview. Officer Hansel reminded Defendant that honesty was the best policy, and while she could not make any promises, she needed to hear his side of the story so that she could explain it to the Minnesota authorities. She told Defendant that he was a good person, and that she could tell he loved his daughter. At this point, approximately forty minutes into the interview, Defendant admitted having sex with his daughter. He continued to speak with Officer Hansel for a little over an hour.

During the interview, which lasted approximately two hours, Defendant never asked for an attorney or to cease the questioning. He understood Officer Hansel's questions and gave appropriate responses. The tone of the interview was generally conversational, although Defendant appeared stressed at times. Occasionally, Officer Hansel reached over and patted Defendant on his knee. Defendant did not appear intoxicated or under the influence of drugs or medication. The entire interview was audio-recorded, and all but eight or nine minutes were video-recorded as well.

B.  **Discussion**

Defendant moves to suppress the portion of the statement made before Officer Hansel advised him of his *Miranda* rights. He also moves to suppress his post-*Miranda* statements as involuntary.

1.  **Statements Preceding the *Miranda* Warning**

The Fifth Amendment privilege against self-incrimination requires a police officer to advise a person of his *Miranda* rights before interrogating him in a custodial setting. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). "Interrogation for *Miranda* purposes refers to any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response from the suspect." *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). There is no dispute that Defendant was in custody throughout the interview with Officer Hansel. The question for the Court, therefore, is whether the statements Defendant made prior to the *Miranda* advisory were the product of interrogation or otherwise admissible under an exception to the exclusionary rule.

Before Officer Hansel began asking questions from the Questionnaire, Defendant made two statements. In response to Officer Hansel's inquiry about how he was doing, Defendant said he was not in the best of moods, considering the circumstances. The Court finds that Officer Hansel's question was not intended to elicit an incriminating response from Defendant, nor should Officer Hansel have known it was reasonably likely to elicit an incriminating response. *See United States v. Hsin-Yung*, 97 F. Supp. 2d 24, 32 n.14 (D.D.C. 2000). Accordingly, the statement should not be suppressed.

When Officer Hansel replied by saying she would be nice, Defendant commented about the nature of his daughter's allegations and her possible motivation. This statement was made

voluntarily and not in response to any interrogation. Accordingly, *Miranda* does not preclude its admission. *See United States v. Waloke*, 962 F.2d 824, 829 (8th Cir. 1992) (citing *Innis*, 446 U.S. at 299-301 (1980)); *see also Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.").

The Court now turns to the statements Defendant made in response to the Questionnaire. Typically, "a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating. Only if the government agent should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny." *McLaughlin*, 777 F.2d at 391-92. Absent this awareness of relevance by the interrogating officer, questions about a suspect's name, date of birth, address, home telephone number, and marriage and family history are not interrogation *See United States v. Lockett*, 393 F.3d 834, 837 (8th Cir. 2005); *McLaughlin*, 777 F.3d at 391; *United States v. Garcia*, Crim. No. 06-269 (DSD/JJG), 2006 WL 3832808, at *4 (D. Minn. Dec. 28, 2006).

In this case, the purpose of the Questionnaire was not only to obtain routine biographical information, but also to gauge Defendant's ability to understand and waive his *Miranda* rights. Both of these aims are legitimate administrative concerns. A waiver of *Miranda* rights is effective only if "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). There is no reason why this inquiry should be performed only in hindsight by a court. It is good police practice for a law enforcement officer, prior to seeking a waiver of *Miranda* rights, to

7

assess a suspect's age, education, intelligence, degree of intoxication, previous interactions with law enforcement, and similar factors that could affect the voluntariness of the waiver.

The questions listed on the Questionnaire were not related to the substantive offenses under investigation, and Officer Hansel did not design the questions to elicit incriminating responses. Officer Hansel asks the same questions of every suspect she interrogates. Under these circumstances, the Court finds that the questions asked prior to the *Miranda* warning were not interrogation, and the statements made prior to the *Miranda* advisory should not be suppressed.

### 2. Voluntariness of the Post-*Miranda* Statements

Defendant does not dispute that Officer Hansel administered a valid *Miranda* warning, that he understood his rights, that he signed a form waiving his *Miranda* rights, or that he agreed to speak with Officer Hansel. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). To succeed, Defendant must show that, under the totality of the circumstances, his "'will [was] overborne and his capacity for self-determination critically impaired.'" *See Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). Further, the Court bears in mind that interrogating a suspect necessarily involves some degree of pressure because the very purpose of an interrogation is to obtain a confession. *See United States v. Astello*, 241 F.3d 965, 967 (8th Cir. 2001).

Defendant argues that his post-*Miranda* statements should be suppressed as involuntary because Officer Hansel exploited his weaknesses, falsely promised that she wanted to help him and B.C., and tricked him with her "deceptive sweetness." (Def.'s Mem. Supp. Mot. Suppress Evid. at 5; Doc. No. 34.) However, an officer's use of deception or compassion "will not render a

confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993). An officer's expressions of sympathy, offers to help a suspect unburden his mind, assurances that the suspect is not responsible, and offers to help the suspect obtain psychological treatment do not necessarily render a confession involuntary. *See Miller v. Fenton*, 796 F.2d 598, 602-03, 605, 607 (3d Cir. 1986) (noting that the "'good guy' approach" is "a permissible interrogation tactic."). The risk is when an officer creates "an atmosphere in which a suspect forgets that his questioner is in an adversarial role, and thereby prompt[s] admissions that the suspect would ordinarily make only to a friend, not to the police." *Id.* at 607.

This did not happen in the instant case. The atmosphere of the interview remained adversarial, despite Officer Hansel's approach. Officer Hansel never said anything to negate the *Miranda* warnings she had administered, nor did she represent she had the authority to influence the charges against Defendant. *See id.* at 609-10. Although Officer Hansel said she wanted to get Defendant and his daughter some help and to explain his position to the authorities in Minnesota, she did not make any direct promises of leniency or treatment in lieu of imprisonment. *See id.* at 610. The entire interview was conducted at the jail, and Officer Bonine remained in the room. Defendant's leg shackles were not removed. Minutes before Defendant confessed to having sex with his daughter, Officer Hansel told Defendant that she had been a police officer for eighteen years, and that she specialized in sex crimes. The Court cannot conclude that Defendant believed this was "an encounter with a compassionate friend" instead of an interrogation by a police officer. *See id.* at 612.

Because Officer Hansel's psychological tactics cannot be viewed in isolation, but as part of the totality of the circumstances, the Court therefore proceeds to other relevant factors,

beginning with Defendant's personal characteristics. Defendant was forty-three years old at the time of the interview. He has a GED and served for two years in the Navy. He held steady employment with the same trucking company for four years. He has prior experience with the criminal justice system, having been in police custody once for operating a vehicle while intoxicated and once for domestic assault. All of these factors weigh in favor of finding his confession voluntary.

Regarding the specifics of the interrogation itself, Defendant was not intoxicated or otherwise impaired during the interview, and he communicated effectively with Officer Hansel. Only one other officer, Officer Bonine was present throughout the interview. The interrogation lasted approximately two hours, which is not an excessive amount of time for the subject matter involved. These factors also weigh in favor of finding Defendant's confession voluntary.

Having considered the totality of the circumstances, the Court concludes that Officer Hansel's interrogation tactics did not render Defendant's post-*Miranda* statements involuntary. While her skillful tactics may have influenced his decision to confess, his decision was ultimately a product of his own free will and capacity for self-determination. Accordingly, the Court recommends that his motion to suppress statements be denied.

### III. EVIDENCE SEIZED FROM DEFENDANT'S SEMI-TRUCK, SEMI-TRAILER, AND RESIDENCE

In Defendant's original motion to suppress evidence, he sought generally to suppress evidence seized pursuant to several search warrants. At the hearing on the motion, however, he clarified that he was only challenging some of the items seized as beyond the scope of the warrants. He asked for an opportunity to submit a post-hearing memorandum in support of his motion, and in that memorandum, filed on August 12, 2010, he specified the following items as outside the scope of the warrants: a Rand McNally road atlas, a Minnesota atlas, two other road

atlases, log sheets and copies of log sheets, a rifle, a shotgun, a black bag containing women's underwear, a bag of KY massage oil bottles, 3 mm syringes of Valium, a letter to B.C. from Human Services, a bill from Planned Parenthood, an envelope with information from Planned Parenthood, and a set of keys. In the Government's post-hearing memorandum, filed on August 16, 2010, the Government represented that it did not intend to offer any of the above evidence at Defendant's trial. Based on this representation, the Court recommends that Defendant's motion to suppress evidence be denied as moot.

**IV. RECOMMENDATION**

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 24) be **DENIED AS MOOT**; and

2. Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 25) be **DENIED**.

Dated: August 20, 2010
      s/ *Jeanne J. Graham*
      JEANNE J. GRAHAM
      United States Magistrate Judge

**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **September 7, 2010**. A party may respond to the objections within ten days after service thereof. Any objections or responses shall not exceed 3,500 words. The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the District Judge is not required to review a transcript or if the District Judge directs otherwise.