UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 10-173 (MJD/JJG) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **POSITION OF DEFENDANT** |
| v. | ) | **WITH RESPECT TO SENTENCING** |
| | ) | |
| KENNETH WILCOX, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

In October, Kenneth Wilcox pled guilty to counts one and two of his indictment,

charging him with interstate transportation of a minor to engage in sexual activity (count

one) and production of child pornography (count two).  He also admitted the rest of

conduct charged out in his case, and thus exposed himself to a potential life sentence.  His

effective sentencing range is 15 years to life, as the  production count carries a mandatory

minimum of 15 years and a statutory maximum of 30 years, and the interstate

transportation count carries a penalty of 10 to life. The advisory guidelines for any one

count of this case results in advisory range of life, even though Mr. Wilcox is a first time

sex offender with no criminal history points. [1]

Mr. Wilcox requests that the court not follow these harsh guidelines for a number

reasons as outlined in this memorandum because a  life sentence for Mr. Wilcox is

---

[1] The interstate transportation counts cross reference the production guidelines because those guidelines are higher, so the guidelines here are based on the child pornography production guidelines, not the sexual abuse guidelines, which are lower.

"greater than necessary" to comply with this court's sentencing directives under 18

U.S.C. 3553(a) and a life sentence would be unreasonable for this first time offender.  Mr.

Wilcox asks that the court impose a lessor sentence in light of his first time sex offender

status, his lack of any significant criminal history, because he is remorseful for what he

has done, he is amenable to treatment and desires treatment,[2] he himself is the victim of

unreported and untreated sexual abuse in his youth, and he has demonstrated his

commitment to change by his efforts at self help and therapy during the course of his

incarceration.  Accordingly, Mr. Wilcox requests that the court impose a sentence of

twenty years and lifetime supervision as an alternative to a lifetime of  imprisonment.

## FACTS

Ken Wilcox is a forty-four year old man with no significant prior criminal record

and no prior history of engaging in any kind of sexual misconduct.  He was born in a

small town in rural Indiana and soon after he was born his parents moved to the country

in a small house in an area a wooded area by a creek that he remembers as the "Gullly."

Ken has one brother, David, four years older than him.  His father was an abusive

alcoholic, and his parents divorced when he was very young.  Although he saw his father

periodically when he was growing up, his biological father played little role in his

upbringing.  What memories he has of his father is that is that of an alcoholic who

belittled him as a young child and that throughout his youth,  his father would use what

---

[2]  The defense will be filing a psychosexual evaluation (under seal) addressing risk
assessment and also a personal letter from Mr. Wilcox outlining his desire for therapy which
also discusses his ongoing attempts at self help while he has been in custody.

2

little involvement he had in his son's life as an opportunity to beat him down, and would constantly remind him that he would never amount to much.

After Ken Wilcox's mother divorced she hooked up with another equally abusive alcoholic. He brought his own older sons into the family, and they lived together for a year or so in the "Gully," and then moved into a campground outside a small town in Indiana when Ken was six or so. They lived in a series of campers in the campground until Ken was seven or eight. Dick Stumberger was emotionally abusive to his mother and physically abusive to Ken's older brother. Mr. Stumpberger's eldest son sexually abused six year older Kenneth for a year or two; that was his introduction to the world of sex. This older step brother kept Ken quiet by beating him up and threatening him if he told anyone what he was doing. Ken Wilcox never disclosed to anyone that was sexually abused at this young age until these proceedings.

Kenneth's mother kicked Mr. Stumberger out of their lives after a physical confrontation, and she hooked up with Goerge Mallinson soon after. George worked in telephone and cable repair and installations and traveled frequently with his job. He had a pull behind camper and they lived in it for awhile, then moved back to the "Gully" for a short time after they married. When Ken was nine or so, his older brother moved back in with their biological father, and after this time Ken was raised a solitary child. He remembers traveling around Ohio and living in a tent for part of a year with his new father and his mother. After that, George moved the new family back to New York, where George was from and had family, and they moved into an apartment with George's

3

mother.  After that they moved into a mobile home neighborhood in a small town in New

York.  Ken and his family lived in this area of New York in apartments or mobile homes

until his mother divorced again when he was 14 or 15, and by that time was in and out of

school and running away frequently.

Kenneth Wilcox has few fond memories of this childhood.  His mother had her

own issues, was somewhat erratic and dysfunctional, and had problems with men, and the

first men she attracted to were abusive and were drinkers.  While George was different,

he was never a father figure to Ken, and after they moved to New York he worked all the

time, and so Ken was raised  without a father figure in his life.  He tended towards

hanging out with older men in the neighborhood, and they directed him to smoking,

drinking and eventually drugs.  When he was arrived in New York, he was an outsider

who never fit in.  He was a country hick who wore overalls and cowboy boots.  He was

small in stature, and was constantly bullied and beaten down by the other kids.  He did

not fit in.  The New Yorkers let him know it.

By the time he was thirteen he was a regular smoker and by the time he was

fourteen had already developed a drinking problem.  He drank regularly (it was easy to

get) and smoked pot (when he could get it) and used the drugs and alcohol for relief from

his teenage loneliness, isolation, and depression.  Older alcoholics and drug addicts in his

mobile home neighborhood became his role models.

He got a job working at a nearby trailer park when he was twelve or thirteen,

shoveling snow and mowing lawns for the trailer park manager.  That man paid Ken to let

4

him perform oral sex on him.  Ken had been exposed to sex since he was abused as a six

year old; and he let this older man abuse him in return for money and alcohol.  This seems

to have been an almost natural progression and tendency for a childhood abuse victim

who was raised without any inkling of self esteem.

Before his mother got divorced again, she had an affair with another man.  His

mother let this man's teen age daughter move in with her and Ken, and she turned her

attention to this new "step daughter,"which further isolated Ken within his own home.

When he was fourteen or so, his grandmother back in Ohio (a person who showed him

love and a person he cared deeply for) died and he became depressed and "snapped."  He

became angry and started fighting back.  He drifted further towards unhealthy behavior.

By the  ninth and tenth grades, he was truant from school often and started running away

frequently, often times ending up back in Indiana, staying with relatives or hooking up for

short periods with his abusive biological father.  During these teenage years, everything

started falling apart in his life, and in the middle of tenth grade he dropped out of school

(a move he deeply regrets to this day) and became a minimum wage earner, working at

McDonalds, Burger King, and at various restaurants (dishwasher, cook), and doing

whatever else came his way for the next few years, continuing on with the drinking and

sexual promiscuity, both of which were becoming addictions.

Seeking some direction and trying to figure out a way out of New York, he joined

the military in 1988 at age 22.  He spent two years in the Navy, and eventually drank

himself into a stupor and out of the Navy.  After two years he and the Navy had a mutual

parting of the ways, and he received a general discharge under honorable conditions.

After the Navy, he got trained and certified as a commercial trucker, and that

became his vocation.  It was natural fit for him because he got to work by himself, was on

the road a lot, and he was able to drink when he was not on the road driving.  His abusive

childhood and the intra familial dysfunction surrounding his upbringing had already left

him isolated and truck driving was a perfect fit.  He also drifted towards woman that were

generally needy and dysfunctional. After the military, he moved back to the Indiana and

Illinois area, and had his first short term marriage in 1990 when he was about 24 years

old.  That did not last long, and he met another woman and got married in 1993. She was

with him on the road for most of a year before that relationship fell apart (although the

divorce did not get completed until 2001).  In addition to these two marriages, he had at

least two other good relationships with other woman; he lived with Sherry between

marriages in 1991-1993, and she was a good lady but his sexual addiction and being on

the road ruined that relationship (affairs while on the road).  Then from about 1996 to

2001 or so, he was engaged to another woman, Bobbi, and this was a good relationship.

This period of time this coincided with his only DWI (1998) and after that he went though

treatment and completely stopped drinking for the next few years.  The end of that

relationship came after her family made accusations of him fooling around on her; in

response he ended up doing just that and their relationship was over.

### THE MOVE TO MINNESOTA

Ken met Ann C., (BC's mother), at a truck stop in Rogers in 1992.  She was a dishwasher, and they had a one night stand that turned into a short term affair.  He lost track of her after she moved from Rogers and quit working at the truck stop.  A year or so later he was served with child support papers and was surprised to learn that he had fathered a daughter.

Around 2001, Ann got a hold of Ken Wilcox, informed him that BC was having issues and wanted to see her Daddy, and asked him to come to Minnesota to be with them.  BC was about eight years old, and Ken was having problems with his relationship with Bobbi.  He needed a change, and thought it would be a good idea to get away from everything in his past, so in 2001 he moved to Minnesota to try to become a father and start a new life.  It did not work out the way he planned.

Ann had her own problems[3], and Ken did not exactly know her that well.  BC was already having behavioral issues, and while he undertook the role of being a parent, he was ill equipped for the role, and brought the baggage of his past along with him.  And, unfortunately, his sexual addiction came into play about the time that BC entered puberty and he began taking her on the road with him when she was twelve or thirteen or so.

**THIS OFFENSE**

---

[3] Her father had raped her and her mother suffered from mental illness; Ann became the head of a rather dysfunctional household as a teenager, suffered from low self esteem (like Wilcox), was incapable of doing housework of any kind (their house was an utter complete mess, really complete squalor akin to a garbage house) and, although she was a nice person, she had a lot of issues.

Ken Wilcox's relationship with Ann never really took off or blossomed into anything healthy after he moved back to Minnesota to be with her and help raise his daughter. It became clear after awhile that she was not interested in him sexually, and he turned increasingly to his growing obsession with pornography, and specifically internet porn, after he moved to Minnesota. Over the years, he had already obtained a vast collection of tapes, dvd's and magazines, mostly of which were adult porn.[4] After he quit drinking, (1998 or so[5]), his spare time and energy were increasingly consumed by his sexual addiction. While had always been sexually active and promiscuous, and over the years, he fed his desire with a variety of partners, one night stands, and pornographic materials, which originally were magazines, then tapes, then dvd's; after he moved to Minnesota, his sexual obsession (it was an addiction) got worse, undoubtedly fueled by his unsatisfying and uncomfortable relationship with Ann, his lack of any meaningful friendships, his loneliness and the growing isolation as a truck driver living in a small town in rural Minnesota, and a lifetime of unchecked dysfunction.

After he arrived in Minnesota, and moved in with Ann, he was introduced to the internet for the first time. Internet porn became an obsession and gave him instant access to endless hours of all kinds of previously unavailable pornography. Over the next few

---

[4] His rather extensive pornography collection, referenced in the PSR, was primarily adult material, although there was some teenage material. He was not particularly interested in images involving younger children.

[5] Following his DWI in 1998, he went through some treatment and quit drinking. He was completely sober for a few years, and has had some brief relapses over the years, but he was able to overcome that life time addiction. Unfortunately he replaced it with another one.

years, it gradually took over and viewing porn on the internet became almost his sole

interest outside of the necessity of going to work.

When BC was twelve or thirteen or so, she was sent to a foster care home. There

were problems that developed when she was in foster care, and she ended up being

referred by the juvenile court for a short term placement at a juvenile center. After she

got out of there, she became enrolled in an internet school program. So it came to be that

Mr. Wilcox began traveling regularly with his teenage daughter on the road. The bulk of

the abuse occurred on these road trips, although Wilcox dates the start of the abuse

somewhat later than does BC. None of this was preplanned or the product of any

carefully planned scheme. There is no prior history of abuse here for Mr. Wilcox. He

had never abused another child, teenager, adult. [6] He was on the road traveling for long

periods of time with his daughter, his sexual addiction took over, and he began abusing

his daughter. This continued for several years, and during the course of those travels and

on several occasions, he set up his 8mm video camera and he made the films (all were on

the one 8mm tape) that form the basis for the production counts of the indictment. This

tape was shared with no one and was never meant for distribution.

The other rather odd and disturbing piece of evidence here are the "sex contracts."

The sex contracts were the by product of something Mr. Wilcox saw and copied off a web

site. The contracts were never enforced or actually amounted to much. As sick and

depraved as these contracts read, they were never much more than words on paper to him

---

[6] As noted in the objections to the PSR, he denies abusing BC's teenage friend CLH.

and did not define their relationship, nor were they adhered to or expected.  It was the function of an admittedly depraved and sexually addicted mind.  As aberrant and despicable as these contracts read, we ask that the court consider them for what they are, the depraved musings of an admitted sex addict, they were not rules of behavior governing BC that were ever seriously considered to be followed.  It is also noteworthy that in her initial interview in which she disclosed all the horrible things that she had been through with her father,  she did not mentioned these contracts.   Accordingly, it is our request that the court temper the natural reaction to these bizarre and rather despicable contracts with the fact that they in reality  did not amount to much more than abusive words on paper;  Mr. Wilcox realizes these contracts shows how sick his sexual behavior and thinking had become with his daughter and is embarrassed and ashamed about them.

**ARREST, ACCEPTANCE OF RESPONSIBILITY, AND A DESIRE TO REFORM**

Ken Wilcox was arrested in Iowa (he was on the road driving at the time when the allegations surfaced back at home) after his daughter disclosed to authorities in Minnesota that she had been sexually abused by her father for several years.  He was arrested, detained, and the next day was confronted by an officer trained in interviewing sex offenders.  It did not take long for him to break down and confess, and it was pretty obvious that he was remorseful, he was asking for help, and he was sincerely concerned about what he had done, and wanted some help to deal with his issues.

Mr. Wilcox spent nearly six months in state court custody before the federal government filed their charges in this case.[7]  He pled guilty without a fuss and admitted all of the conduct in the indictment knowing that he was exposing himself to a potential life sentence.  He stepped up to the plate and pled guilty, never thought about putting his daughter through a trial; his guilty plea itself was a sincere demonstration of his acceptance of responsibility for what he had done to his daughter.

Since being incarcerated, Mr. Wilcox has embarked on a path of self-help, therapy, and reform.  While in the Faribault County jail, he became involved in a program called "House of Healing," a faith based recovery program, that was offered through their local jail.[8]  He started looking for self help therapy books, and obtained a copy of "At the Altar of Sexual Idolatry," (Steve Gallagher) a therapy program for sex offenders, and started working his way through those materials.  When he arrived at the Sherburne County jail last summer, he initially went through a period of severe depression and frustration.  Last fall, he resumed his self help path.  He obtained a new copy of "At the Altar" (his original copy was taken from him by the jail) and its corresponding workbook, and he worked through the lessons provided in those materials.  He also got a copy of the "Houses of Healing" book that the course is based upon, and again he worked through those materials.  He also picked up where he had left on the religious training he started while

---

[7]  The State charges are still pending.

[8]  The program coordinator has verified that he was involved in the program and that he was an active and interested participant who seemed committed to making changes in his life.

he was in the Martin County jail.  He began doing correspondence courses with several

religious (Christian) ministries that offer correspondence courses.  There has been a

profound change in attitude and he has demonstrated a sincere commitment to find out

what drove him to his behaviors, tackle the demons of his past, face the consequences of

his conduct, and at least try to do something good for himself.   While he recognizes that

he cannot undo that which he has done, and he cannot undo the harm he perpetrated on

his innocent daughter, he at least has demonstrated a commitment to seek therapy, deal

with his addictions and abusive conduct, and try to do something about it rather that

wallow in his sorrow.


### §3553(a) DISCUSSION-WHAT IS A REASONABLE SENTENCE?

The advisory guideline computations are not disputed in this case. [9] Those

guidelines, of course, are only advisory and the guidelines are not entitled to a

presumption of reasonableness.  "The Guidelines are not only *not mandatory* on

sentencing courts; **they are also not to be *presumed* reasonable**."  Nelson v. United

---

[9]  While the guidelines are not disputed, the defendant has objected to and does object to
the factual allegations in par. 6 of the PSR including the claim that he engaged in sexual abuse of
BC's friend CLH.   CLH and her mother were family friends, and CLH's mother permitted her to
travel on the road with him twice in the summer of 2007 (alone, BC was not on these trips). Mr.
Wilcox has always steadfastly maintained that he never engaged in sexual abuse with her. Mr.
Wilcox maintains that the only person he has ever abused is BC. He denied abusing CLH when
he was first interviewed and confessed, and offered then and offers still to take a  polygraph, if
necessary, regarding her claim. While the defense believes that resolution of her claim is not
necessary to arrive at a fair and just sentence here, the defense objects to these facts and asks that
the court not rely on this disputed factual allegation in its sentencing decision and also asks that
the allegation be stricken from the PSR.

States, 129 S.Ct. 890, 894 (2009)(emphasis added).  Even in pre-guidelines practice, the

fact that the sentencing guideline calculations were determined to be arithmetically

accurate, however, still did not mean that they constituted an appropriate, reasonable, and

just sentence in any case.  "It has been uniform and constant in the federal judicial

tradition for the sentencing judge to consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and punishment to ensue."  Koon v. United States, 518 U.S. 81, 113

(1996).  The Supreme Court has ruled emphatically that the guideline sentence is not to

be presumed reasonable in any individual case and that the Court "must make an

**individualized assessment** based on the facts presented" in each case.  Gall v. United

States, 128 S.C. 586, 602 (2007).

In United States v. Booker, 543 U.S. 220 (2005), the United States Supreme Court

ruled that the United States Sentencing Guidelines are advisory, and ruled that district

courts must examine all of the factors set forth in 18 U.S.C. § 3553(a) and impose a

sentence that is "sufficient but not greater than necessary" to accomplish the goals of

sentencing.  A triad of 2007  Supreme Court decisions strengthened the holding of

Booker and reaffirmed the principle that federal courts must determine sentences based

on the facts and unique circumstances of the particular case, and that the guidelines no

longer enjoy a presumption of reasonableness.  Gall v. United States, 128 S.Ct. 586, 602

(2007) (courts may not presume that the Guidelines range is reasonable but must make an

"individualized assessment" based on the facts of the case before it); Kimbrough v.

13

United States, 128 S.Ct. 558, 570 (2007) (the guidelines are advisory and it was not an

abuse of discretion for the court to conclude that the crack guidelines yielded a sentence

greater than necessary to serve the objectives of sentencing); Rita v. United States, 127

S.Ct. 2456, 2465 (2007) (sentencing courts do not enjoy the benefit of a legal

presumption that the Guidelines sentence should apply). The import of these decisions is

that federal district court judges are "free to make [their] own reasonable application of

the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines."

Kimbrough, 128 S.Ct. at 577 (Scalia, J., concurring).

 While in practice a district court still must calculate the advisory Guidelines range,

the Court must listen to the parties' arguments in support of a particular sentence and

ultimately make an independent sentencing decision after consideration of all of the

sentencing factors set forth in 18 U.S.C.§ 3553. As the Court explained in Gall:

> [A]fter giving both parties an opportunity to argue for whatever
> sentence they deem appropriate, the district judge should then
> consider all of the § 3553(a) factors to determine whether they
> support the sentence requested by a party. In so doing, [s]he
> may not presume that the Guidelines range is reasonable. [S]he
> must make an individualized assessment based on the facts
> presented.

Id. (citation and footnote omitted). Accordingly, while the courts must take into account

the advisory guideline as one part of all of the sentencing factors enumerated in 18 U.S.C.

§ 3553, they are no longer bound by the sentencing range indicated by the applicable

guideline in the case. Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856, 867

(2007). The net result of the decisions is that "the range of choice in sentencing dictated

by the facts of the case has been significantly broadened." U.S. v. Goodman, 2008 WL 1766759 at 5 (D.Neb. 2008).

The advisory nature of the guidelines is now beyond dispute.  In its two most recent opinions on the topic, the Supreme Court reemphasized that it is proper for a District Court to reject the guidelines and that the guidelines are not entitled to a presumption of reasonableness.  In Spears v. United States, 129 S.Ct. 840 (2009), the Court again reversed the Eight Circuit in a crack cocaine sentencing case, stating that Courts are free to reject the guidelines based on either an individualized assessment or categorical rejection of the guidelines: "[W]e now clarify that District Courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."  Id. at 843-844.

Similarly, in Nelson v. United States, 129 S.Ct. 890,  2009 WL 160585 (Jan. 26, 2009), the Court reversed the Fourth Circuit for affirming a within-guidelines sentence despite the sentencing judge's statements at sentencing that "the Guidelines are considered presumptively reasonable" and that "unless there's a good reason in the [3553(a)] factors . . ., the Guidelines sentence is the reasonable sentence."  The Supreme Court observed:

> The Guidelines are not only ***not mandatory*** on sentencing courts; **they are also not to be *presumed* reasonable**.  We think it plain from the comments of the sentencing judge that he did apply a presumption of reasonableness to Nelson's Guidelines range.  Under our recent precedents, that constitutes error.

Id.  (Emphasis in original, bold face added).

15

Many federal district courts have recognized that the sentencing guidelines for child pornography and child exploitation offenses, like the drug-trafficking guidelines analyzed by the Court in Kimbrough, were not developed by the guidelines commission using  empirical data reflecting the Commission's use of their unique expertise and could be rejected.  In United States v. Baird,  District Judge Bataillon noted that "the Guidelines for child exploitation offenses, like the drug-trafficking Guidelines, were not developed under the empirical approach, but were promulgated, for the most part, in response to statutory directives." United States v. Baird, 580 F.Supp.2d 889, 893 (D. Neb. 2008). The Court noted that the sentencing commission itself has acknowledged the shortcoming of guidelines driven by statutory directives: "[T]he frequent mandatory minimums legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to discern the influences of the Commission from those of Congress." Id. at 894, quoting USSG, Fifteen Year Assessment,  at 73.   Accordingly, "because [these] guidelines do not reflect  the Commission's unique institutional strengths, the Court affords them less deference than it would to empirically-grounded guidelines."  Id.

In another child pornography case, the Honorable Lynn Adelman, United States District Judge, District of Eastern Wisconsin, reached a similar conclusion and pointed out the "serious flaws" with the child pornography guidelines and the lack of empirical data that supports  them.  In United States v. Hanson, 561 F. Supp.2d 1004 (E.D. Wisc., 2008).  Judge Adelman observed:

> [M]uch like the crack guidelines criticized by the Supreme Court in <u>Kimbrough</u>, guideline 2G2.2 is not representative of the Commission's typical role or of empirical study.  The guideline has been steadily increased despite evidence and recommendations by the Commission to the contrary. . . . To the extent that the advisory guidelines deserve continued respect from courts, that respect will be greatest where the Commission has satisfied its institutional role of relying on evidence and study to develop sound sentencing practices.  This guideline simply does not represent that role, as the Commission itself has acknowledged.

<u>United States v. Hanson</u>, 561 F.Supp.2d at 1099 (E.D. Wisc., 2008).  Judge Adelman noted that the initial establishment of the child pornography guidelines and the numerous subsequent amendments of  these guidelines were not representative of the Commission's typical role nor based on  empirical study.  The Court noted that the Commission itself sought to persuade the Congress not to adopt many of these proposed changes and the guidelines have been repeatedly increased despite evidence and recommendations by the Sentencing Commission to the contrary: "To its credit, and as in the crack cocaine context, the Commission sought to persuade Congress not to make such changes, but to no avail."  Id.   The Court concluded that "given all the flaws in the guideline range discussed," the guidelines did not deserve deference, and sentenced the defendant significantly below the advisory guideline range.  <u>Id</u>. [10]

In <u>United States v. Shipley</u>, 560 F. Supp.2d 739 (S.D. Iowa, 2008), Chief Judge Pratt  similarly  rejected the mechanical  application of the  child pornography guidelines

---

[10]  Hanson pled guilty to transporting child pornography which carried a guideline range of 210-262 months and the Court sentenced him to 72 months.

17

in a child pornography "trading" case, likewise observing that the child pornography

guidelines were not based on empirical data and were thus less deserving of deferential

treatment than empirically based guidelines:

> [T]he guidelines for child exploitation offenses were not
> developed using an empirical approach by the Sentencing
> Commission, but were rather mainly promulgated in response
> to statutory directives. The Protect Act directly amended
> guideline 2G2.2 by amending the guideline enhancements for
> specific offense characteristics. **These modifications do not
> appear to be based upon any sort of empirical data, and
> the Court has been unable to locate any particular
> rationale for them beyond the general revulsion that is
> associated with child exploitation -related offenses.** ...Thus,
> because the guidelines at issue in this case do not reflect the
> unique institutional strength of the sentencing Commission in
> that they are not based on study, empirical research, and data
> ...this court "affords them less deference than it would to
> empirically grounded guidelines."

United States v. Shipley, 560 F. Supp.2d at 744 (quoting Kimbrough, emphasis added).

The Court in Shipley also dispensed with the argument that the Court should

simply defer to the guidelines because they reflected Congressional intent: "As to any

argument that the guidelines reflects Congressional intent to punish child sex offenses

harshly, a guideline in not a statute. The statute here provides a broad range of

punishment for this crime, and if Congress does not want the courts to try and sentence

individual defendants throughout that range based on the facts and circumstances of each

case, then Congress should amend the statute, rather than manipulate an advisory

guideline and blunt the effectiveness and reliability of the work of the Sentencing

Commission. While the Court has consulted the advice of the Guidelines, the advice in

this case is less reliable than in other cases where the guidelines are based on study and

empirical data." Id. Accordingly, the Court rejected the guidelines in favor of a

significantly reduced sentence after applying the criterion of § 3553(a). Id. [11]

Accordingly, numerous courts throughout this country have refused to follow the

advisory guidelines in child pornography and child exploitation cases because the

guidelines advise sentences that are "greater than necessary" and are thus unreasonable,

especially for first time offenders. Over two years ago, Judge Bennett (Northern Iowa)

summarized the arguments and cases rejecting categorical application of the child

pornography guidelines. In United States v. Beirmann, 599 F.Supp.2d 1087 (N.D. Iowa,

2009), he observed:

> Even before *Spears*, numerous district courts had read *Kimbrough* to
> permit a sentencing court to give little deference to the guideline for child
> pornography cases on the ground that the guideline did not exemplify the
> Sentencing Commission's exercise of its characteristic institutional role and
> empirical analysis, but was the result of congressional mandates, often
> passed by Congress with little debate or analysis. *See, e.g., United States v.
> Baird*, 580 F.Supp.2d 889,892 (D.Neb. 2008); *United States v. Goldberg*,
> 2008 WL 4542957, *6 (N.D.Ill. April 30, 2008); *United States v. Shipley*,
> 560 F.Supp.2d 739, 744 (S.D. Iowa 2008); *United States v. Hanson*, 561
> F.Supp.2d 1004, 1009-1011 (E.D.Wis.2008); *United States v. Ontiveros*,
> 2008 WL 2937539, ** (E.D. Wis. July 24, 2008); *United States v.
> Grinsbergs*, 2008 WL 4191145, *5-*8 (D.Neb. Sept. 8, 2008); *United
> States v. Stults*, 2008 WL 4277676, *4-*7 (D.Neb. Sept. 12, 2008); *United
> States v. Noxon*, 2008 WL 4758583, *2 (D.Kan. Oct. 28, 2008); *United
> States v. Johnson*, 588 F. Supp.2d 997, 1003-05 (S.D. Iowa 2008); *United
> States v. Stern*, 590 F.Supp.2d 945, 960-61 (N.D. Ohio 2008); *United States
> v. Gellatly*, 2009 WL 35166, *5-*7 (D.Neb. Jan. 5, 2009); *see generally*,

---

[11] Shipley was charged with receiving child pornography for his involvement in trading
child pornography through a "file sharing program," his advisory guideline range was 210-240
months, and the Court sentenced him to 90 months imprisonment.

Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (hereinafter, Stabenow, *Deconstructing the Myth*) (July 3, 2008)[available at www.fd.org] . . .

United States v. Beiermann, 599 F.Supp.2d 1087, 1100 (N.D. Iowa, Feb. 24, 2009).

Accordingly, Judge Bennett:

> [J]oined  my brethren who find that the child pornography guideline, U.S.S.G. § 2G2.2, which is the result of congressional mandates, is entitled to considerably less deference than other guidelines that *are* based on the Commission's exercise of its institutional expertise and empirical analysis. . .

*Id.* at 1103. He went on to reject those guidelines categorically:

> I find that U.S.S.G. § 2G2.2 should be rejected on categorical, policy grounds, even in a "mine-run" case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case.. . . . My first policy objection to U.S.S.G. § 2G2.2 is that the guideline does not reflect empirical analysis, but congressional mandates that interfere with an undermine the work of the Sentencing Commission.. . . My second policy objection is that the guideline impermissibly and illogically skews sentences for even "average" defendants to the upper end of the statutory range, regardless of the particular defendant's acceptance of responsibility, criminal history, specific conduct, or degree of culpability. . . . . In short, the harsh advisory guideline sentences pursuant to U.S.S.G. § 2G2.2 for child pornographers, whatever their criminal conduct, criminal histories, or personal characteristics, reflect a "put them doen the oubliette" mentality that has nothing to do with imposing a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  *See* 18 U.S.C. § 3553(a).  These flaws mean that this guideline is not only entitled to a little deference, but that I am entitled to reject it entirely.

20

United States v. Beirmann, 599 F.Supp.2d at 1087. Judge Bennett sentenced the

defendant in that case to 90 months in a distribution case where the guidelines for that

first time offender were at the statutory max of  210–262. Id.

Moreover, while this case,  of course,  is not a possession or distribution case, and

involves both production and sexual abuse, the criticism of these draconian non-

empirically based guidelines as applied in those cases remains the same here. The

production guidelines (§2G2.1), which are driving the advisory life guideline

computations sentence here, suffer from the same shortcomings as  the possession and

distribution guidelines (§2G2.2) that have been criticized in the various opinions

discussed above.  Indeed, Judge Bennett rejected strict application of the production

guidelines in an internet luring/exploitation case using a similar analysis as was employed

in Beirmann.   In U.S. v. Jacob, 631 F. Supp.2D 1099 (N.D.Iowa, 2009)  a case involving

an attempt to lure a minor using the internet  to Iowa to engage in sex and related

transportation/computer charges, the defendant's guidelines called for life, and the court

sentenced the defendant to 151 months.  The court observed:

> Thus, I find that U.S.S.G. § 2G2.1 can be rejected on
> categorical, policy grounds.  As in *Beiermann*, having rejected
> a particular guideline, I find that the appropriate, reasoned
> alternative to application of the flawed guideline is for the
> sentencing judge to begin with the base offense level, which
> reflects the mandatory minimum statutory sentence, U.S.S.G. §
> 2G2.2(a) or U.S.S.G. § 2G2.1(a), and then to consider
> appropriate identified factors but to give those factors more
> appropriate weight in the determination of a particular
> defendant's sentence. *Beiermann*, 599 F.Supp. 2d at 1107.  As
> I explained in *Beiermann*, such "cherry picking" and re-

21

weighing of factors from the guideline is appropriate-in-deed, totally consistent with the exercise of my discretion to apply the 18 U.S.C. § 3553(a) factors-because it reflects the extent of my categorical and policy disagreement with the guideline. *Id*.

Yet, even were I not inclined to reject U.S.S.G. §2G2.1 on categorical, policy grounds, in every case, I find that application of U.S.S.G. § 2G2.1 yields an excessive sentence in this case, when due consideration is given to the 18 U.S.C. § 3553(a) factors. The application of those factors, in the third step of the sentencing methodology, follows, but for purposes of the second step of the sentencing methodology, suffice it to say that I will vary downward from the guideline sentence. . . . .

Recognizing that Jacobs has committed serious crimes, but that, for all of the reasons discussed in detail above, the applicable advisory sentencing guidelines are not reliable indicators of the Sentencing Commission's perspective on a fair sentence-and, indeed, the advisory guideline sentence must be rejected both on categorical, policy grounds, even in a "mine-run" case, and certainly must be rejected on the basis of an individualized determination in this case-I find that a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing, in light of all of the pertinent factors, *see* 18 U.S.C. § 3553(a), is 151 months of incarceration followed by 10 years of supervised release for the Iowa "enticement" offense.

Similarly, in <u>U.S. v. Krueger</u>, 2009 WL 4164122 (E.D.Wis, 2009) Wisconsin Judge Adelman rejected the production guidelines along similar grounds and sentenced that defendant to 210 months, in a case where the guidelines called for much greater sentence (262-327 months). In that case the person produced video of his own small children and engaged in sexual activity with his minor children. As to her decision not follow the guidelines in that case, she wrote:

22

Regarding the guidelines' recommendation, I have written in other cases about the flaws in U.S.S.G. § 2G2.2, the guideline applicable to child pornography possession, receipt and distribution. *See, e.g. United States v. Phinney*, 599 F.Supp.2d 1037 (E.D. Wis.2009); *United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wis.2008). Because this was a production case, some of those criticisms were inapplicable. However, the production guideline, § 2G2.1, does suffer from at least some of the same flaws as § 2G2.2, as the court recently discussed in *United States v. Jacob*, 631 F.Supp. 2d 1099, 1114-15 (N.D.Iowa 2009) . . . .

Despite these flaws, I did not reject the guideline in any categorical fashion. This case did not present the same type of situation I often see in § 2G2.2 cases, where enhancements present in most cases create a range approaching or exceeding the statutory maximum. *See Hanson*, 561 F.Supp.2d at 1010-11. Section 2G2.1 also contains enhancements for commission of a sexual act, § 2G2.1(b)(2), and the defendant as parent of the victim, § 2G2.1 (b)(5), both of which applied in this case. These factors may not be present in most cases and seem a sensible way of recognizing more serious offenses.

In dealing with guidelines that are not fully reflective of Commission study and expertise, the court may elect to also consider that statutory range, starting with the mandatory minimum and considering any appropriate aggravating circumstances in the particular case, some of which may be listed in the guideline. *See, e.g. Jacob*, 631 F.Supp. 2d at 1115; *United States v. Wachowiak*, 412 F.Supp.2d 958, 964 (E.D.Wis.2006), *aff'd*, 496 F.3d 744 (7th Cir. 2007). I engaged in such an analysis in this case.

Accordingly, Judge Adleman, eschewed the advisory guidelines and upon application of the §3553 sentencing factors, arrived at a more reasonable sentence of 216 months for that first time offender.

The guideline recommendation for a life sentence in this case should be rejected for a reasonable sentence which takes into account that Mr. Wilcox is a first time sex offender,  his lack of any significant prior criminal record, the fact that he appears to be an eminently treatable sex offender, that he has demonstrated a desire and commitment for treatment, and that his life history includes the fact that he himself is an untreated victim of past sexual abuse who never received help, and that he presents a  relatively low risk of recidivism.  These factors suggest that he is not one of those few, indeed hopefully rare, first time offenders for whom a lifetime of incarceration is appropriate or reasonable.  A life sentence for Mr. Wilcox simply cannot be squared with this courts directive to impose a sentence not greater than necessary and to apply the sentencing factors set forth in 18 U.S.C. § 3553(a).  A life sentence for this first time offender, even under the unusual and egregious facts presented, is irrational and cruel, and reduces this gentleman to a monster unworthy of any degree of compassion or understanding.  Mr. Wilcox deserves fairer consideration.

## INCEST OFFENDERS

However strange and despicable the behavior, particularly the facts here, incest offenders are amongst the most treatable and least likely to re-offend.  While one may be aghast at the thought of a father-daughter sexual abuse, the incest offender presents remarkably different characteristics than the rapist or the person who preys on children outside the family unit.  Indeed, there may be a significant etiological basis for many such sex abusers, and Mr Wilcox certainly fits this profile.  Michael Seto is recognized as a

24

leading expert in the field of pedophilia and sex offenders, and in his recent book he

described one common incest pattern which seems to describe Mr. Wilcox:

> The most parsimonious explanation for father-daughter and brother sister incest is that it is a function of sexual opportunity.  In Seto et al. (1999), we suggested that some men who prefer sexually mature females will have sexual contacts with their daughters or stepdaughters because they do not have satisfactory access to their preferred group of sexual partners.  Reasons for this might include dissatisfaction with their current relationships; an inability to attract an adult female partner because of low status, lack of resources, or physical unattractiveness; or a particularly high sex drive.  Men adjust their sexual behavior as a function of their access to potential adult partners (e.g., Landolt, Lalumiere, & Quinsey, (1995).  Although they are not preferred by most heterosexual men, both prepubescent and pubescent girls still elicit some sexual arousal (Freund, Mcknight, Langevin, & Cibiri, 1972).  Men who do not have access to their most preferred partners might seek out other partners who are still sexually attractive to them, following what has been described as a *sexual preference gradient*.  In other words, heterosexual men who do not have access to adult women would seek out prepubescent or pubescent girls before they would seek out same-sex partners.  Similarly, some heterosexual males without any access to females will engage in same-sex contacts in all-male environments such as boarding schools or prisons. . . .

> Theories that focus on family dysfunction as a cause of incest might also represent opportunistic offending (e.g., Maddock & Larson, 1995).  In these theories, incest occurs when the parental relationship has broken down and the mother is sexually and emotionally unavailable.  For example, a father may turn to his eldest daughter to fulfill his sexual and emotional needs because his spouse is depressed and uninterested in having sex with him.  In essence, his daughter is placed in a spousal role.  There are some data consistent with this view.  Lang, Langevin, van Santen, Billingsley, and Wright (1990) compared 92 incest offenders (86% were genetic fathers or stepfathers) with 42 nonoffending controls and found that the incest offenders reported less communication with their partner, felt more lonely, and were less satisfied with their partners. . . .

Seto,   <u>Pedophilia and Sexual Offending Against Children: Theory, Assessment and Intervention</u> (American Psychological Association, 2008) pp. 133-134.

While these explanations at etiological origins may be imperfect, they are offered here to temper the rush to characterize Mr. Wilcox as a monster, when in fact he is a person that until five or so years ago, had never abused anyone -  adult, teenager, or child, despite years of living with other woman and their children.  Until these events happened, he had demonstrated none of the characteristics of being a sexual predator or an evil person.  It is undoubtedly one of the reasons that he is plagued with guilt and remorse and is diligently undertaking whatever form of self help and therapy he can find within the confines of his imprisonment.   Despite the despicable nature of his underlying offenses,  he is not a monster or an inherently evil person.   He has both a conscience and a measure of self introspection rarely seen within the sex offender population.

Mr. Wilcox wants treatment.  He does not like what he has become, and he intends to work the rest of life to fix it,  regardless of the sentence imposed here.  If he ever gets fixed (or something close to it), he intends to go about helping others, because that is the kind of person he is.  However, he knows he must first fix himself, and he probably has years of therapy ahead to get where he needs to be.

Above and beyond a commitment to seek treatment and participate in whatever programs are available in federal prison,  he also has a plan for the future.  There are a number of select faith based places in this country that will work with sex offenders to house them and continue on with treatment upon their release from prison, and even

26

though that future is years and years away, he is intent on joining one of those places

assuming this court permits him to be released from prison one day.   He only hopes that

any such release date is not so far distant that he can still make some contribution to

society and assist other  offenders to help them through what he is going through now and

will continue in the future.

## APPLICATION OF THE 3553(a) FACTORS

Under 18 U.S.C. § 3553(a) the Court shall impose a sentence "sufficient, but not

greater than necessary" and shall consider

(1) the nature and circumstances of the offense and the history and
characteristics of the defendant;
(2) the need for the sentence imposed--
        (A) to reflect the seriousness of the offense, to promote respect for
        the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational
        training, medical care, or other correctional treatment in the most
        effective manner;

**1.      The nature and circumstances of the offense**

There can be no question that Mr. Wilcox's has committed a serious offense and

that he inflicted significant harm on his daughter.  Indeed, no one would call this offense

anything less than serious.

**2.      Mr. Wilcox's individual  characteristics.**

As articulated above,  Mr. Wilcox does have a personal history, including being

raised in what must only be characterized as a dysfunctional environment.  Within that

childhood he himself was subject to unreported and untreated sexual abuse, circumstances that no child (as his daughter here) should be subjected to.  Until the events which have unfolded here, he was a law abiding, employed and productive member of society, and he abused no others.  He is intent on treatment and reform, and if ever given the chance, will reach out to help other people.  His entire life history and status as a first time sex offender goes straight to the heart of the statutory sentencing factors and demonstrates  that the recommended guideline sentence of life is far greater than necessary to achieve the sentencing statute's goals.

**3.     Just punishment**

Mr. Wilcox deserves a lengthy sentence.  The effect of a sentence of twenty years will have a significant effect on Mr. Wilcox.  He has never been imprisoned before. Despite the best efforts of the Bureau of Prisons, time spent in custody convicted of a child pornography/child abuse offense is potentially far more punishing in terms of the way he will be treated by other offenders.

**4.     Deterrence**

A federal sentence in the neighborhood of twenty years will have a significant deterrent effect on Mr. Wilcox.  He is forty four years old, and will be in his sixties when he gets out.  He is unlikely to re-offend following such a lengthy incarceration, after treatment, and being subject to the strict conditions of supervised release.  Moreover, a sentence of twenty years is hardly going to be characterized as being light and to the

questionable extent that there is a deterrent effect on others, such a severe sentence will have a strong and entirely sufficient deterrent effect on others.

**5.      Protection of the public**

Mr. Wilcox has indicated that he is receptive to treatment, and that he will be capable of complying with the heightened supervision requirements that accompany federal supervision.  As an offender in his sixties when he gets out, and following years of imprisonment and treatment, he is unlikely to present a danger to the public or a significant danger to repeat.   He will be closely managed by intensive supervised release required of sex offenders, including sex offender registration, that will be imposed after his release.  His future supervision will no doubt include limits on his access to  children and the internet.

6. **The Need For Treatment**

Mr. Wilcox desires treatment and requests that he be sent to a facility with mental health and sex offender treatment programs.  A sentence of twenty years will offer him the opportunity to get the treatment he desires.

**CONCLUSION**

Mr. Wilcox is a person, not a monster.  He desires treatment and has started on the path to right his wrongs and do the best with the lengthy imprisonment that will follow. He does not want to be discarded, and even though his crimes are horrible, he requests that the court give due consideration to the fact that he is first time offender, he himself is an untreated abuse victim, and he wants at least some ray of hope to see a future some day

29

so that he can apply himself while in prison, work at fixing himself, and be able to help others when he gets out some day.  A sentence of twenty years is sufficient but not greater than necessary in this case and is so requested.


Dated:  April 1, 2011

                                       Respectfully submitted,

                                       ***s/ Douglas Olson***

                                       DOUGLAS OLSON
                                       Attorney ID No. 169067
                                       Attorney for Defendant
                                       107 U.S. Courthouse
                                       300 South Fourth Street
                                       Minneapolis, MN 55415